UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CLARENCE DOUGLAS., both individually )
and as parent and next friend of A.D., a minor, )
)
    Plaintiffs, )
)
v. )
)
JENNIFER SHAW, in her individual capacity, )  Docket No. _____
)
and )
)
STATE OF MAINE, DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
)
)
    Defendants. )

**COMPLAINT AND DEMAND FOR JURY TRIAL**
_____

Plaintiff, Clarence Douglas ("Plaintiff"), individually and as parent and next friend of A.D., his minor daughter ("A.D."), submits this Complaint against Defendant, Jennifer Shaw, in her individual capacity, ("Shaw") and Defendant, State of Maine, Department of Health and Human Services ("DHHS"), as follows:

## **PARTIES**

1. Plaintiff resides in the County of Yuba in the State of California.

2. A.D., Plaintiff's daughter, was born in 2009. She currently resides solely with him.

3. Upon information and belief, Defendant Shaw resides in the Town of Turner, County of Androscoggin, State of Maine. At all relevant times, Shaw has worked as a case worker in the Child Protective Unit of DHHS.

4. Defendant DHHS is an agency in the State of Maine and is a recipient of federal financial assistance.

## JURY TRIAL DEMAND

5. Under Rules 38(b) of the Federal Rules of Civil Procedure, Plaintiff, individually and as parent and next friend of A.D., demands trial by jury on all issues triable to a jury.

## JURISDICTION

6. The Court has subject matter jurisdiction of Plaintiff and A.D.'s claims pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000d, and 42 U.S.C. § 1983.

## VENUE

7. Venue is proper under 28 U.S.C. § 1391(b)(2) as "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## FACTS

### Background

8. Plaintiff is the biological father of A.D.

9. Jennifer Douglas ("Mother") is the biological mother of A.D.

10. A Divorce Judgment in case no. LEWDC-FM-12-550, dated December 31, 2012 (the "Divorce Judgment"), provided Plaintiff and Mother with joint and shared custody of A.D. The order specified that (a) they would have shared parental rights and responsibilities,

(b) A.D. would have her primary residence with Mother, and (c) Plaintiff would have all reasonable rights of contact with A.D.

11. The Divorce Judgment specifically provided for Plaintiff and Mother to have **equal** parental rights and responsibilities. It required the two to confer and make joint decisions regarding A.D.'s welfare, including her education, religious upbringing, medical care, dental care, mental healthcare, travel arrangements, child care arrangements, and residence. It further required each of them to keep the other informed of any major changes affecting A.D.'s welfare.

12. Plaintiff is a veteran.

13. Plaintiff is Black.

14. Mother is white.

15. When Plaintiff was actively serving in the military, he was not able to spend much time with A.D. due to circumstances beyond his control. (For example, for the first few years of A.D.'s life, he was stationed in Korea.) From the day A.D. was born, however, Plaintiff always loved her fiercely and wanted a close relationship with her.

16. Mother sometimes made it difficult for Plaintiff to have access to A.D. and would try to keep A.D. all to herself.

17. For years, Plaintiff was not in a financial position to fight for his parental rights in court.

18. Mother's family helped to facilitate contact between Plaintiff and A.D. when Mother's family had A.D. in their care. Mother's family members have been supportive of Plaintiff. They understand his love for his daughter, his upstanding character, and how

important it is for A.D. to have a close relationship with her father, despite the geographical distance that once existed between them.

19. Plaintiff currently resides on Beale Air Force Base in California with his wife (who is active military) and his four other children.

20. After years of petitioning, A.D. finally went to live with Plaintiff, her step-mother, and her half-siblings in California from June through August 2017. Plaintiff and Mother agreed that A.D. would spend every summer with Plaintiff from 2017 forward.

21. A.D. spent the summer of 2018 with Plaintiff in California, but not in 2019.

22. In addition to spending summers together, Plaintiff and A.D. had regular video chats and telephone contact. They developed a close bond.

### **DHHS Removes A.D. From Her Mother's Care**

23. In June 2017, Mother began dating a man named Joshua Day ("Josh"). Soon after, Mother became pregnant with Josh's child. Josh and Mother moved in together. Mother gave birth to A.D.'s half-sister ("E. Day").

24. Josh also has a daughter from a previous relationship ("A. Day").

25. Josh's parents are Lesley Day ("Mrs. Day") and Michael Day ("Mr. Day"). Mr. and Mrs. Day were very heavily involved in the upbringing of A. Day before Mother came into their son's life. After she came into his life and had a baby with him, they continued to play a large role in their grandchildren's lives.

26. On the night of Sunday, September 29, 2019, Mother and Josh were drinking and fighting. This prompted A. Day to reach out to her grandparents for help. Mr. and Mrs. Day

arrived, called the police, and subsequently took their grandchildren and A.D. to their home, separating all three children from Mother and Josh.

27. When A.D. went to school the next day, she told her guidance counselor about what had happened. The guidance counselor called Child Protective Services ("CPS") at DHHS.

28. On Tuesday, October 1, 2019, Shaw initiated an investigation on behalf of CPS. She conducted interviews of A.D. ("A.D.'s Interview") and Mother ("Mother's Interview").

29. In her interview, A.D. told Shaw that, when drunk, Mother sometimes would punch her or slap her, that Mother was often drunk around her, that she drank daily, and that Mother would sometimes drink and drive when A.D. was in the car. A.D. also told Shaw that Josh drank daily.

30. Through her investigation, Shaw learned that Mother is white. She could deduce from looking at A.D. that Plaintiff must be Black.

31. During A.D.'s Interview, Shaw did not ask any questions about her father.

32. During Mother's Interview, Mother brought up to Shaw that she had been married and divorced from A.D.'s father. Shaw, however, asked no questions about Plaintiff or the terms of their Divorce Judgment, which establishes Plaintiff's rights with respect to his daughter. Mother told Shaw that Plaintiff had texted her recently, thanking her for being supportive of his relationship with A.D., writing, "You have no idea how much I appreciate it."

33. Despite being presented with evidence that Plaintiff was active in serving as A.D.'s father, Shaw did not ask Mother any questions about Plaintiff other than requesting

5

his phone number, so she could notify him that DHHS had become involved. Conversely, Shaw asked Mother whether Josh had any criminal history.

34. Acting under color of law and within the scope of her DHHS authority, Shaw removed A.D. from Mother's care based on the information she discovered through her investigation.

## Shaw Wrongfully Keeps A.D. From Her Father

35. The next morning, Wednesday, October 2, 2019, Shaw called Plaintiff in California (the "Phone Call"). She told him DHHS had removed A.D. from Mother's care because there was evidence that (a) Mother was an unfit parent due to physical abuse, (b) there was daily alcohol abuse occurring in the home, and (c) A.D. was being exposed to domestic violence. Shaw told Plaintiff that A.D., having been removed from Mother's care, would be staying with the parents of Mother's boyfriend, Mr. and Mrs. Day.

36. Plaintiff was extremely upset by what Shaw told him in the Phone Call. He told Shaw that he had joint and shared custody of A.D. and would be on a plane that very day to retrieve her immediately.

37. Acting under color of law and within the scope of her DHHS authority, Shaw told Plaintiff during the Phone Call that he was not allowed to come get his daughter.

38. Plaintiff protested and asked Shaw to explain her reasoning. She refused to explain her reasoning, other than to say that it would not be possible for Plaintiff to retrieve A.D. because Shaw did not know whether A.D. would be safe with him.

6

39. Plaintiff explained that Shaw had no right to deny him access to his daughter. He explained that he had shared custody of A.D. and that there was absolutely no evidence that he was an unfit or unsafe father.

40. Shaw kept arguing with Plaintiff and would not give in. Plaintiff pleaded with her, explaining that he had no mental health issues, no criminal history, no CPS history, and emphasizing that he had every right to collect his daughter immediately. Acting under color of law and within the scope of her DHHS authority, Shaw refused Plaintiff's requests and denied him access to A.D.

41. The typical practice of DHHS when a child is deemed to be in jeopardy due to the unsafe actions of a Maine parent with primary residence is to permit an out-of-state parent with shared custody to retrieve the child.

42. If Shaw had allowed Plaintiff to retrieve A.D. pursuant to his request, then he could have subsequently petitioned the Court to obtain primary residence of A.D., which he planned to do given the situation with Mother.

43. Having been denied the opportunity to retrieve A.D., Plaintiff learned that DHHS would be seeking custody of A.D. through the courts. Shaw told Plaintiff that she needed to serve him with the court papers; he emailed Shaw on October 6th to provide instructions on how to serve him, given his residence on a military base. When Shaw told Plaintiff she had never served anyone on a military base before, Plaintiff offered to go pick up the paperwork himself at the local police station near the base. Shaw never responded to Plaintiff's offer and ceased communicating with Plaintiff following the initial exchange of email messages about service.

7

44. In the meantime, on October 2, 2019, acting under color of law and within the scope of her DHHS authority, Shaw prepared a sworn affidavit and petition to the Court requesting an order granting DHHS custody of A.D. (the "Petition"). The purpose of the Petition was to remove the parental rights of both Mother and Plaintiff.

45. In the Petition, Shaw represented to the Court that it was contrary to A.D.'s welfare to remain in Mother's home because she was in circumstances of jeopardy and in need of protection. But in section 9 of the Petition, which requests information about relatives capable of providing care for the child, Shaw wrote only, "Lesley and Michael Day, fictive relatives."

46. Shaw represented to the Court that A.D. was in immediate risk of serious harm and in need of protection pending entry of a final protection order, despite knowing that (a) her Black father (Plaintiff) had shared custody of A.D., (b) Plaintiff was ready, willing, and able to pick her up immediately, and (3) there was no evidence suggesting that Plaintiff was an unfit parent.

47. On October 2, 2019, the Court granted Shaw's Petition, signing an Order of Preliminary Child Protection (the "Preliminary Order"). The Preliminary Order finds A.D. to be at immediate risk of serious harm for the reasons stated in Shaw's affidavit, and grants custody to DHHS. The Preliminary Order, therefore, robbed Plaintiff of his parental rights with respect to his daughter.

48. The Court scheduled a hearing for October 15, 2019 (the "October Hearing"). It instructed Shaw to serve Plaintiff so that Plaintiff could appear at the October Hearing.

**Shaw Fails To Serve Plaintiff In A Timely Manner**

49. Shaw never followed up with Plaintiff after October 6, 2019, when he provided her with instructions on how to serve him at the California military base.

50. The Court assigned Plaintiff counsel, Meridith Lord, Esq., on or about October 10, 2019. Although Attorney Lord appeared at the October Hearing, she was not able to participate in the proceedings because Shaw had yet to serve Plaintiff. All she could do was observe.

51. Aside from Attorney Lord, also present at the October Hearing was Shaw, Mother, Mother's Attorney, Assistant Attorney General Courtney Goodwin, and the assigned Guardian Ad Litem, Norma Miller Murray, Esq. (the "GAL").

52. During the October Hearing, Mother waived her rights to a Summary Preliminary Hearing.

53. Also at the October Hearing, acting under color of law and within the scope of her DHHA authority, Shaw argued to the Court that Plaintiff was an absent father and that reasons existed to remove Plaintiff's parental rights, although she provided the Court with no valid support for her position.

54. The GAL, having met with A.D. prior to the October Hearing, countered Shaw's argument. The GAL explained that (a) Plaintiff was not an absent father, (b) Plaintiff and A.D. had developed a close relationship, and (c) A.D. had asked to go live with her father in California.

55. Nevertheless, the Court sided with Shaw and DHHS at the October Hearing. It continued the Preliminary Order, further depriving Plaintiff of his parental rights.

56. By October 22, 2019, Shaw had still not served Plaintiff.

57. On October 22, 2019, Plaintiff emailed Shaw the following communication:

> Greetings Ms. Shaw,
>
> Tomorrow, it will be 25 days since my daughter was removed from her mother's care due to drunken abuse. Tomorrow, will be 22 days since you notified me of the incident. You have had my correct address and phone number since the 2 October 2019. Furthermore, as you requested, I gave you the contact information to the nearest police station and I have volunteered to go there and pick it up. By now, I should have been served or contacted to pick up the paperwork concerning my daughter's case. The fact that I have not been served and you have done no explaining as to why I have not been served is unacceptable. Also, you do owe me an explanation as to why my rights as father have been removed, especially since I do have joint/shared custody of my daughter. Everything that you are doing to me is a direct violation of my civil rights, as a father and as an American Citizen. Because of you, I have missed one court hearing already. Because of you, my lawyer is very limited. Serve ME ASAP!
>
> I asked you if I can contact CPS here to help you, you have yet to provide me an answer. I have no CPS cases against me, I have no criminal record, I am not an absent father, and I have complied with everything this far. Why are you not doing your job and or why are you trying to keep me from my daughter? You need to have me served or contact me ASAP!
>
> Clarence Douglas

58. Shaw never responded to Plaintiff's email, nor did she explain the reason for her delay. Shaw finally did serve Plaintiff on October 24, 2019.

### The Google Duo Meeting And The Admission Of Racial Bias At Play

59. Upon information and belief, DHHS removed Shaw from A.D.'s CPS case in or around the beginning of November 2019, replacing her with a different case worker, Kala Costantino ("Kala"). Plaintiff has reason to believe that Kala continued to look to Shaw for guidance in A.D.'s case even after she formally became the new case worker. For example,

10

upon information and belief, Mrs. Day continued to call and work with Shaw to obtain support, even though Shaw was no longer the assigned case worker.

60. In December 2019, Plaintiff, Attorney Lord, Kala, and the GAL met over a video chat conducted through a Google Duo call (the "Google Duo Call").

61. Plaintiff told Kala and the GAL that it was very nice to finally meet them. The GAL stated that she had known about Plaintiff from the beginning, as A.D. had told her how close she was with her father. The GAL also said she had seen a photo album of the two of them on A.D.'s bedstand, and that it was clear to her that Plaintiff was a good father. She said, "Clarence, I am going to apologize to you. All of this is happening because you're Black."

62. Kala did not disagree with the GAL's characterization of what had occurred to Plaintiff. She said that out-of-state parents with shared custody routinely come to retrieve their children from Maine when CPS discovers that continued residence with the parent in Maine would place the child in jeopardy.

63. Plaintiff explained that he is a veteran, holds an associate's degree in biology and a bachelor's degree in public policy, with a focus on politics and government, and that he is in graduate school for government with a focus on law and public policy. He told Kala and the GAL that he has never been to jail, has served this country for 12 years, and has been paying taxes since he was 16 years old. He expressed that he should not have been treated differently from other out-of-state parents with shared custody just because he is a Black man.

64. The other participants on the Google Duo call agreed and apologized for what was happening to Plaintiff.

**Shaw's Baseless Case Against Plaintiff Finally Dismissed On March 10, 2020**

65. On November 4, 2019, Plaintiff, through Attorney Lord, filed a Motion to Vacate the Preliminary Protection Order and Dismiss the Protective Custody Matter or Alternatively Request a Summary Preliminary Hearing Seeking Custody.

66. On November 27, 2019, the Court granted Plaintiff's Motion for a Summary Preliminary Hearing and ordered the Clerk to schedule the hearing on or before December 8, 2019. Unfortunately, based on information and belief, the paperwork fell through the cracks when the Clerk took a medical leave of absence, and no hearing was held before December 8, 2019.

67. Ultimately, the Court dismissed the case against Plaintiff with prejudice on March 10, 2020. By then Plaintiff and Mother had modified their Divorce Judgment to provide Plaintiff with primary residence of A.D.

68. Although A.D. went to live with her father in California in January 2020, she should have been able to be with him as soon as October 2, 2019. She was forced to live with Mr. and Mrs. Day (instead of her father) for over three months. This delay would not have occurred but for Shaw's and DHHS's racial animus toward Plaintiff.

69. This delay caused both Plaintiff and A.D. severe emotional distress.

## COUNT I
### *(Clarence Douglas v. Jennifer Shaw)*
**Violation of Equal Protection**
**42 U.S.C. § 1983**

70. Plaintiff repeats the allegations contained in Paragraphs 1 through 69.

71. Under 42 U.S.C. § 1983, every person who, under color of State law, subjects another person to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

72. The Equal Protection Clause of the Fourteenth Amendment prohibits racial discrimination.

73. Shaw acted under color of State law and within the scope of her official duties when she failed to inquire about Plaintiff or his involvement in A.D.'s life during her investigation of the case on October 1, 2019, including her failure to ask questions about Plaintiff during her interviews with A.D. and Mother.

74. Shaw acted under color of State law and within the scope of her official duties when she petitioned the Court for DHHS to take custody of A.D., and when she misrepresented to the Court that there was reason to remove Plaintiff's custodial rights.

75. Shaw acted under color of State law and within the scope of her official duties when she forbade Plaintiff from coming to pick up his daughter immediately upon his request made on October 2, 2019.

76. Shaw acted under color of State law and within the scope of her official duties when she failed to serve Plaintiff prior to October 15, 2019, and to communicate with him

about her efforts to serve him in a timely fashion, robbing him of the opportunity to participate in the October Hearing.

77. Both the GAL and Kala confirmed to Plaintiff that he should have been provided with immediate access to his daughter on or about October 2, 2019, and that racial bias was the reason he was deprived of this right.

78. Shaw took the actions described above because Plaintiff is Black, thereby violating the Equal Protection Clause of the Fourteenth Amendment.

79. As a direct and proximate cause of Shaw's violation of Plaintiff's rights, Plaintiff has suffered severe harm.

## COUNT II
### (Clarence Douglas v. Jennifer Shaw)
### Violation of Procedural Due Process
### 42 U.S.C. § 1983

80. Plaintiff repeats the allegations contained in Paragraphs 1 through 79.

81. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3.

82. The procedural component of the Due Process Clause prohibits governmental actors from depriving Plaintiffs of liberty and property interests without providing due process in connection with the deprivation.

83. To establish a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him with adequate procedural rights.

84. Plaintiff had a liberty interest in the right to avoid arbitrary governmental interference with his right to parent A.D., as the relevant court order provided him with shared custody of his daughter.

85. Having shared custody of A.D., Plaintiff had a fundamental right to retrieve A.D. from Maine as soon as the Maine DHHS determined that it should remove her from Mother's care.

86. Plaintiff had a fundamental right to not be robbed of his custody rights, even temporarily, when Shaw had no reason to believe he was an unfit parent.

87. Plaintiff had a fundamental right to be served prior to the October Hearing so that he could appear in Court and object to Shaw's baseless interference with his rights.

88. Plaintiff had a fundamental right to remain together with his daughter without the coercive interference of the awesome power of the state.

89. Shaw, acting under color of State law and within the scope of her official duties, deprived Plaintiff of his rights described above without due process of law.

90. As a direct and proximate cause of Shaw's violation of Plaintiff's rights, Plaintiff has suffered severe harm.

## COUNT III
**(A.D. v. Jennifer Shaw)**
**Violation of Procedural Due Process**
**42 U.S.C. § 1983**

91. Plaintiff repeats the allegations contained in Paragraphs 1 through 90.

92. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3.

93. The procedural component of the Due Process Clause prohibits governmental actors from depriving Plaintiffs of liberty and property interests without providing due process in connection with the deprivation.

94. To establish a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must show that (1) she had a life, liberty, or property interest protected by the Due Process Clause; (2) she was deprived of this protected interest; and (3) the state did not afford her with adequate procedural rights.

95. A.D. had a fundamental right to remain together with her father without the coercive interference of the awesome power of the state.

96. Shaw, acting under color of State law and within the scope of her official duties, deprived A.D. of her fundamental right without due process of law.

97. As a direct and proximate cause of Shaw's violation of A.D.'s fundamental right, A.D. has suffered severe harm.

## COUNT IV
### (Clarence Douglas and A.D. v. Jennifer Shaw)
**Violation of Substantive Due Process**
**42 U.S.C. § 1983**

98. Plaintiff repeats the allegations contained in Paragraphs 1 through 97.

99. The substantive component of the Due Process Clause of the Fourteenth Amendment prohibits government from taking action that "shocks the conscious" or "interferes with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

100. Shaw violated the Due Process Clause of the Fourteenth Amendment by taking actions (described above) which harmed both Plaintiff and A.D., and which "shocks the conscious" and/or "interferes with rights implicit in the concept of ordered liberty."

101. Shaw's actions were not narrowly tailored to achieve any compelling government interests, there was no rational basis for Shaw's actions, and Shaw's actions were not reasonably related to any legitimate government interests.

## COUNT V
### (Clarence Douglas and A.D. v. DHHS)
**Intentional Race Discrimination by A Federally Assisted Program**
**42 U.S.C. § 2000d**

102. Plaintiff repeats the allegations contained in Paragraphs 1 through 101.

103. Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 2000d.

104. Upon information and belief, Maine's Department of Health and Human Services is subject to 42 U.S.C.A. § 2000d because it receives or has received Federal financial assistance.

105. DHHS intentionally discriminated against Plaintiff and A.D. on account of their race when interfering with Plaintiff's right to parent A.D.

106. The actions of DHHS in violation of Title VI of the Civil Rights Act of 1964 have caused Plaintiff and A.D. to suffer severe harm.

WHEREFORE, Plaintiff Clarence Douglas, individually and on behalf of his minor daughter, A.D., respectfully requests that the Court enter judgment against Defendants and award them:

a. Compensatory damages in an amount that is reasonable in the premises, including, but not limited to, damages for general and non-economic damages, economic damages, pre-judgment and post-judgment interest;

b. Punitive damages in an amount appropriate under the circumstances;

c. Their reasonable costs and reimbursement of their attorney's fees; and

d. Such other relief as the Court deems just and proper.

DATED: August 28, 2020          /s/ Alison E. Tozier,
                                Alison E. Tozier, Esq., Bar No. 5633
                                atozier@mpmlaw.com

DATED: August 28, 2020          /s/ Richard O'Meara
                                Richard L. O'Meara, Esq., Bar No. 3510
                                romeara@mpmlaw.com

                                Attorneys for Plaintiff Clarence Douglas, individually and as parent and next friend of A.D.

MURRAY PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
Tel: (207)773-5651
Fax: (207)773-8023